IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| RHONDA MOORE,<br><br>       Plaintiff,<br><br>   vs.<br><br>TRINITY HEALTH CORPORATION and CATHOLIC HEALTH INITIATIVES – IOWA, CORP. d/b/a/ MERCYONE DES MOINES MEDICALCENTER,<br><br>       Defendants. | 4:25-cv-00045-SHL-SBJ<br><br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION.

Defendants terminated Plaintiff Rhonda Moore's employment after concluding that she violated workplace policy by threatening to kick a co-worker. Moore admits to making the threat but argues the true reason for her termination was race- or color-based discrimination. Because the undisputed facts show otherwise, the Court GRANTS Defendants' Motion for Summary Judgment. (ECF 26.)

## II.    FACTUAL BACKGROUND.[1]

Moore is a Black woman who formed an employment relationship with Trinity Health Corporation ("Trinity") in early to mid-2022. (ECF 36-1, ¶¶ 1–2.) Moore has her Bachelor of Science in Nursing, her Master of Science in Nursing Administration, her Master of Business Administration, and her Doctor of Nursing Practice. (ECF 36-2, ¶ 1.) She has extensive experience as both a critical care nurse and an executive nurse leader. (Id., ¶ 2.)

In late December 2023, Moore accepted a contract to work at MercyOne. (ECF 36-1, ¶ 3.) Trinity assigned Moore to MercyOne Des Moines as the Interim Market Director of Acute Care Services. (Id., ¶ 4.) The parties dispute whether MercyOne was Moore's employer, but the Court will presume for present purposes that it was. (Id., ¶ 5.) Moore decided to end her contract on April 6, 2024, due to conflicts with Interim Chief Nursing Officer Dr. Coleman, who is a Black woman. (Id., ¶ 6.) Moore had lodged several complaints about Coleman. (Id.) Later that month, however,

---

[1] On a motion for summary judgment, the Court resolves all disputed facts and draws all reasonable inferences in favor of the plaintiff as the non-moving party. *See Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 760 (8th Cir. 1998).

Moore changed her mind and decided to stay. (Id., ¶ 7.) On April 21, 2024, she became the Interim Market Director for Critical Care at MercyOne Des Moines. (Id., ¶ 8.) MercyOne was excited to have Moore stay and hoped she would consider staying permanently. (Id., ¶ 9.) MercyOne leaders described her as "amazing" and said she was doing a "great job." (Id., ¶ 10.) Moore had no issues with MercyOne leadership. (Id., ¶ 11.)

In early May 2024, Moore exchanged text messages and one or two phone calls with Kyla Rogers, a nurse manager in MercyOne's Behavioral Health Unit. (Id., ¶¶ 12–15.) The parties' filings do not provide the full context for these communications, but it appears that Rogers wanted to resign from her position. (ECF 36-2, ¶ 8.) Moore and Rogers planned to meet on May 7, 2024. (ECF 36-1, ¶ 16.) The day before the scheduled meeting, however, Moore went to Rogers's office at the end of her shift. (Id., ¶ 17.) This was their first in-person meeting. (Id., ¶ 18.) Moore's goal was to determine if she could retain Rogers as an employee. (ECF 36-2, ¶ 8.) After Moore arrived, however, the interaction became heated and Moore realized the relationship could not be salvaged. (Id., ¶ 9.)

Moore and Rogers offer competing views of what happened during the next several minutes. Consistent with the summary judgment standard, this Order will adopt Moore's version of events. Based on the heated nature of the interaction, Moore told Rogers her employment was terminated effective immediately and asked for her badge and keys. (Id., ¶ 10.) Rather than hand Moore those items, Rogers tossed them. (Id., ¶ 11.) As they walked out of the building, Moore used her badge to open a door, following which Rogers "hooked" the bottom of the door with her foot. (Id., ¶ 12.) In doing so, she almost kicked Moore. (Id., ¶ 13.) Moore believed Rogers was going to kick her. (Id.) In response to the threatening motion from Rogers, and in fear of being kicked, Moore said, "please be careful, if you kick me, I will kick you back." (Id., ¶ 14.) Rogers asked if that was a threat. (Id., ¶ 15.) Moore said, "yes, if you kick me, I will absolutely kick you back." (Id., ¶ 16.) Moore continued to walk Rogers out of the building. (Id., ¶ 17.)

Shortly after the incident occurred, Moore described it to her supervisor and others by email as follows:

> I escorted this colleague off the campus today at 07:15 after her escalating behavior. When escorting her, she kicked the door open and almost kicked me. I informed her to "be careful…." because if she kicked me, I was going to kick her back. She asked if I was threatening her, I firmly told her "yes, if you kick me I will absolutely kick you back…" After which she called

the police and informed them that she "wanted a unit sent out because a MercyOne Administrator threatened me…"

(ECF 36-1, ¶ 20.) During her deposition, Moore admitted that she indeed made the statement about kicking Rogers. (Id., ¶ 49.) All the same, Moore viewed Rogers as the aggressor in the incident and felt threatened by her. (ECF 36-2, ¶ 18.)

MercyOne and Trinity initiated an investigation of the incident. (ECF 36-1, ¶ 29.) Helen Smith, now the Regional Manager of Colleague Relations for MercyOne, interviewed Moore on multiple occasions within a couple of days of the incident. (Id.; ECF 36-2, ¶ 19.) According to Smith's notes, Moore reported that she felt threatened by Rogers throughout the incident. (ECF 36-1, ¶ 30.) Smith's notes further state that Moore had "no regrets" and said she was "protecting herself." (Id.) "[Moore] stated, If someone kicks me, harms me, I will protect myself and she has no apologies for saying that. [Moore] said, I did warn her and I told her to be careful. [Rogers] is young, this is how I would treat my kids, by giving ample warning." (Id.) Moore views herself as the "original complainant" regarding the May 6 incident, not Rogers. (ECF 36-2, ¶ 21.) Moore reported to Smith that Rogers was volatile during the incident. (Id., ¶ 22; ECF 36-1, ¶ 30.)

For her part, Rogers made statements to Smith during the investigation that were inconsistent with video footage regarding the proximity between Moore and Rogers as they walked out of the building. (ECF 36-2, ¶ 26.) Rogers also made statements to Smith that were not consistent with text messages, although Moore does not identify the nature of the inconsistency. (Id., ¶ 24.) Rogers and Moore disagree about what Moore allegedly said during the encounter. (Id., ¶ 27.) Smith could not verify that Rogers made any type of kicking motion or action but had no reason to doubt Moore's perception that what happened was threatening. (Id., ¶¶ 28, 30.) Moore explained to Smith that what Rogers characterized as a "threat" was better characterized as a "promise" of the type Moore would make to her children. (Id., ¶ 32.) Smith did not believe the way Rogers spoke to Moore was appropriate. (Id., ¶ 33.)

MercyOne and Trinity have policies prohibiting threats in the workplace, including a policy identified by the parties as the Threats and Violence in the Workplace Policy. (ECF 36-1, ¶¶ 34, 50.) The policies state that termination is a potential consequence of workplace threats, although it is not identified as the *only* consequence. (Id., ¶ 51.) Smith's investigation report ended up concluding that Moore violated the Trinity Health Code of Conduct and Threats and Violence in the Workplace Policy. (Id., ¶ 34.) Smith acknowledged differences in the respective accounts of Moore and Rogers regarding what happened but concluded that Moore violated the Threats and

Violence in the Workplace Policy even under Moore's own version of events. (Id., ¶ 35.) Following the investigation, MercyOne ended Moore's assignment. (Id., ¶ 36.) Her employment also was terminated. (Id., ¶¶ 36, 40.) The decisionmakers testified that, like Smith, they concluded Moore had violated governing policy even when Moore's version of events was accepted as true. (Id., ¶¶ 37, 40.) Moore's employment ended on May 16, 2024. (Id., ¶ 41.)

Moore asserts that although Smith claimed to have accepted Moore's version of events as true, Smith's investigation report expresses doubts about Moore's intentions and credibility. (ECF 36-2, ¶ 44.) Moore further asserts that MercyOne decisionmakers characterized the Threats and Violence in the Workplace Policy as "zero tolerance" even though the Policy does not state that termination is the only available consequence in the event of a violation. (Id., ¶¶ 35, 57, 58, 73, 74, 92.) Moore includes dozens of paragraphs of facts regarding the analysis conducted by MercyOne decisionmakers involved in the disciplinary decision, which boil down largely to the following: The decisionmakers generally thought highly of Moore, did not dispute that she truly felt threatened during the interaction with Rogers, but recommended that she be terminated anyway due to the relevant policy purportedly being "zero-tolerance." (Id., ¶¶ 50–104.) Moore also includes a few paragraphs suggesting that at least some decisionmakers also had doubts about her credibility. (E.g., id., ¶¶ 78–79, 85.)

During her deposition, Moore was asked a series of questions about whether she had any evidence of racial bias on the part of ten different people involved in the decision to terminate her employment. (ECF 36-1, ¶ 46.) She did not have any evidence of racial bias on the part of any of those decisionmakers. (Id.) She also never heard anyone in Trinity or MercyOne leadership make a race-based statement. (Id., ¶¶ 47–48.) At most, she had a "gut" feeling that one Human Resources employee had racial bias. (Id., ¶ 48.) Moore is not aware of any other employee who admitted to threatening to kick another employee but remained employed. (Id., ¶ 53.)

Moore provides one example of a situation in which, in her view, an employee violated the Threats and Violence in the Workplace Policy but was not terminated. The employee in question, ██████████████████████, was accused of harassment by a co-worker with whom he was in an intimate relationship. (ECF 36-2, ¶¶ 105–06; ECF 36-3, pp. 4–5.) The supervisor who received the complaint also ended up complaining about ███████ behavior. (ECF 36-2, ¶¶ 107–09.) ███████ was told not to come to campus but did so anyway to look for the original complainant. (Id., ¶ 111.) In total, three lower-level employees plus Moore herself expressed concerns about ███████

4

"concerning behavior," yet ██████ was not terminated. (Id., ¶¶ 112–19.) Moore did not know if ██████ admitted making a threat, nor could she provide specific details of any threats. (ECF 36-1, ¶ 55.) At most, she said ██████ made suicidal comments and "alluded to" the safety of his former intimate partner being at risk. (ECF 36-3, p. 4.) ██████ ended up being transferred to a different work location and reduced from full-time status to "prn" status. (Id., p. 5.)

Moore also describes an incident involving an employee, ████████████, who was terminated for making a threatening comment about a MercyOne administrator. (ECF 36-2, ¶ 120.) ██████████ messaged a co-worker and said: ███████████████████ Trinity also believed the statement was potentially a race-based threat. (Id., ¶ 123.)

Moore offers expert testimony from Dr. Jamie Weiner, who has extensive experience on issues related to racial and gender discrimination. (Id., ¶¶ 124–29.) According to Dr. Weiner, a "longstanding and prevalent stereotype attributed to Black women is that of the Sapphire – a wisecracking, loud, hostile and potentially violent Black woman." (Id., ¶ 130.) In addition, Black women have a long history of being treated as untrustworthy. (Id., ¶ 131.) When Black women do not "control their emotionality" in the workplace, even when an emotional response is warranted, they are identified as "aggressive, difficult or angry." (Id., ¶¶ 132–33.) Black women may be perceived as mad, invulnerable, or suffering may be overlooked. (Id., ¶ 135.) "Given those perceptions, it may be the case that individuals would be less inclined to believe that a Black woman would feel physically vulnerable or scared of being injured when threatened, compared to, or because of a White peer." (Id.) People who harbor stereotypes tend to ignore evidence inconsistent with their beliefs and feel entitled to judge based on information that fits their existing theories about the world (i.e., stereotypes), particularly when dealing with those in "outgroups." (Id., ¶ 136.)

Moore brought claims against Defendants for race and color discrimination under the Iowa Civil Rights Act (Count I) and 42 U.S.C. § 1981 (Count Two). (ECF 1-1, pp. 7–8.) Defendants now move for summary judgment. (ECF 26.) Moore resists. (ECF 35.) Moore asked for oral argument (id. ¶ 6), but the issues are straightforward enough that the Court concludes oral argument is unnecessary.

### III.    LEGAL STANDARDS.

#### A.  Summary Judgment Standard.

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

#### B.  Employment Discrimination Standards.

Moore brings claims for race and color discrimination under the Iowa Civil Rights Act (Count I) and 42 U.S.C. § 1981 (Count Two). Those claims are evaluated under the same basic framework. *See Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023); *Walker v. First Care Mgmt. Grp., LLC*, 27 F.4th 600, 604–05 (8th Cir. 2022); *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1097 (N.D. Iowa 2020). The plaintiff in a discrimination case may survive summary judgment by providing direct evidence of discrimination or retaliation based on protected status. *See Mayorga v. Marsden Bldg. Maint. LLC*, 55 F.4th 1155, 1161 (8th Cir. 2022). In the absence of direct evidence, "the plaintiff may establish an inference of discrimination or retaliation under the burden-shifting framework provided by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Anderson v. KAR Glob.*, 78 F.4th 1031, 1036 (8th Cir. 2023). The *McDonnell Douglas* framework is "modified" for the state law claim, *see Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347 (Iowa 2023), although the difference between state and federal law is immaterial here.

Under the *McDonnell Douglas* test, the plaintiff must first establish a prima facie case for race or color discrimination by showing: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances permitting an inference of discrimination. *See Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 937 (8th Cir. 2019). "This burden is not onerous." *Id.* (internal punctuation omitted). The prima facie elements "merely serve the gatekeeping function of eliminating the most nondiscriminatory reasons for adverse employment actions." *Id.* (cleaned up).

If a plaintiff establishes a prima facie case of race or color discrimination, "[t]he burden then shifts to [defendant] to present evidence of a legitimate, non-discriminatory reason for the adverse action." *Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). "If there is a sufficient reason, the burden shifts back to [the plaintiff] to show the proffered reason is pretext for discrimination." *Winters*, 63 F.4th at 690. Once defendant offers a legitimate, nondiscriminatory reason for the adverse action, a plaintiff may prove pretext in a variety of ways, including by showing the employer "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Nelson v. Lake Elmo Bank*, 75 F.4th 932, 938 (8th Cir. 2023) (quoting *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010)). "We have recognized that the showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005). A plaintiff "is also required to show that the circumstances permit a reasonable inference to be drawn that the real reason [the defendant] terminated [her] was because of [her] race." *Id*. Under Iowa law, the plaintiff must show that the "employer's proffered reason is pretextual or, while true, was not the only reason for [her] termination and that [her protected status] was another motivating factor." *Feeback*, 988 N.W.2d at 347.

## IV.    LEGAL ANALYSIS.

### A.  Defendants Are Entitled to Summary Judgment on Moore's Federal Claim.

Moore has not presented any direct evidence of discrimination, and thus the Court must apply the *McDonnell Douglas* burden shifting test. At the first step, the Court will assume without deciding that Moore provided sufficient evidence to establish a prima facie case for race or color discrimination, thus shifting the burden to Defendants to "present evidence of a legitimate, non-discriminatory reason for the adverse action." *Winters*, 63 F.4th at 690. Defendants have satisfied this burden by presenting evidence that Moore was terminated for violating the Threats and Violence in the Workplace Policy. The burden therefore shifts back to Moore to offer sufficient evidence to allow a reasonable juror to conclude that the proffered reason for termination is pretext, and that the real reason for the adverse action was race or color discrimination. *See id.*

Moore has not presented sufficient facts to satisfy this burden. The undisputed facts show that there was an incident in which Moore told Rogers she was going to kick her and answered "yes" when Rogers asked whether it was a "threat," following which police were called to the scene. The undisputed facts further show that Defendants decided to terminate Moore due to this incident. Indeed, Defendants began investigating the incident almost immediately after Moore self-reported it and terminated her at the end of the investigation. This is therefore a straightforward case in which summary judgment is appropriate. No reasonable juror could conclude that Defendants' decision to terminate Moore was based on anything other than the incident in which she threatened to kick Rogers. *See, e.g.*, *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 821–22 (8th Cir. 2017) (affirming summary judgment for employer where proffered reason for termination "had a legitimate basis in fact"); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074–76 (8th Cir. 2006) (affirming summary judgment in favor of a university that banned a disabled student from campus for making what was perceived as a threatening phone call even though the student denied making threats during the call).

Moore raises several arguments to try to avoid this outcome, one of which is that the decisionmakers at Trinity and MercyOne claimed they accepted Moore's version of what happened with Rogers as true when they decided to terminate her but also made statements suggesting they had doubts about what Moore reported. (ECF 35-1, pp. 10–14.) In other words, Moore appears to be arguing that the decisionmakers offered inconsistent reasons for the disciplinary decision. But this argument is self-defeating. If, as Defendants assert, Moore was terminated because she violated the Threats and Violence in the Workplace Policy even when her own account of the incident is accepted as true, summary judgment is appropriate because this is a race-neutral reason for the adverse employment action. Conversely, if the decisionmakers did *not* believe her, the record shows that they still genuinely believed she violated the Policy. They just also believed she lied about it. Thus, in essence, Moore's argument means there might have been two race-neutral reasons for her termination rather than one. *See, e.g.*, *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009) ("The critical inquiry . . . is not whether the employee actually engaged in the conduct for which [s]he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.")

Granted, Moore argues that the reason the decisionmakers did not believe her is because of her race. She was not, however, able to provide any evidence that any of the decisionmakers at

MercyOne or Trinity harbor racial bias. Instead, at most, she is relying on her "gut" and social research and expert opinion evidence about stereotypes regarding Black women. In a situation where the record conclusively shows that the decisionmakers genuinely believed Moore violated the Threats and Violence in the Workplace Policy regardless of the credibility of her version of events, this is not enough to survive summary judgment. *See Liles*, 851 F.3d at 821–22 (affirming summary judgment because plaintiff did not produce evidence indicating that employer's proffered reason for termination was insincere); *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (similar).

Moore also argues that the decisionmakers consistently characterized the Threats and Violence in the Workplace Policy as "zero tolerance" even though a close reading shows that discipline short of termination is permitted. Again, this argument does not mean summary judgment is inappropriate. In essence, Moore's position is that the appropriate remedy was something less than termination. The Eighth Circuit has consistently recognized, however, that anti-discrimination laws "do[] not authorize courts to sit as super-personnel departments reviewing the wisdom or general fairness of an employer's actions against an employee." *Sherman v. Collins*, 158 F.4th 904, 907 (8th Cir. 2025); *accord, e.g.*, *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998). "The Court is therefore not evaluating whether it was a good idea for [Defendants] to terminate [Moore], whether some lesser punishment might have been more appropriate, or even whether [Moore's] conduct actually violated the [relevant] policy." *Snyder v. Arconic Corp.*, 3:22-cv-00027-SHL-SBJ, 2023 WL 6370785, at *11 (S.D. Iowa Aug. 31, 2023) (granting summary judgment). Instead, the sole question is whether Moore has presented sufficient evidence to cast doubt on the sincerity of Defendants' belief that she violated the Threats and Violence in the Workplace Policy. Because she has not done so, summary judgment is appropriate. *See Torlowei v. Target*, 401 F.3d 933, 935 (8th Cir. 2005) (affirming summary judgment despite employee's argument that lesser punishment would have been appropriate).

Finally, to the extent Moore's reference to the incident involving ████████████ is meant as an argument that Defendants treated her differently than a similarly situated white male, the argument fails because the record shows that █████ was not similarly situated. For starters, Moore cannot identify the details of any threatening statements he allegedly made toward others; instead, at most, she said he made suicidal statements and "alluded to" the safety of a co-employee being at risk. Moreover, █████ was not in a leadership position, had been in an intimate

9

relationship with the co-employee against whom he made the threat, did not supervise anyone that he allegedly threatened (if he made any threats at all), and ended up being moved to a different location and reduced from full-time work to something else. (ECF 36-3, pp. 4–5.) Thus, █████ did not deal with the same supervisor, was not "subject to the same standards," and did not "engage[] in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000). It follows that he is not similarly situated. *See id.* The closer person in terms of a "similarly situated" comparator is █████, who *was* fired for making threats, just like Moore.

The bottom line is that Moore was terminated based on admittedly threatening to kick a subordinate co-worker. As this is a race- and color-neutral reason for her termination, summary judgment is appropriate on Moore's § 1981 claim.

*B. Defendants Are Entitled to Summary Judgment on Moore's ICRA Claim.*

For the same reasons, summary judgment is appropriate on Moore's state law claim under the ICRA. In *Feeback v. Swift Pork Company*, the Iowa Supreme Court adopted the "honest belief rule" that has been applied for years in the Eighth Circuit in federal employment discrimination cases. 988 N.W.2d at 349. Here, Defendants are in an even stronger position than most cases involving the "honest belief rule" because Moore admits making the threat attributed to her. Thus, it is undisputed that Defendants terminated her employment for a race- and color-neutral reason. *See id.* at 350 (holding that employer was entitled to summary judgment where undisputed facts showed that employee texted expletive to supervisor after negative performance review). The Iowa Supreme Court likewise applies the same general test as the Eighth Circuit for determining whether a comparator is similarly situated. *See id.* at 350. Thus, for the reasons stated above, █████ is not a similarly situated comparator for purposes of Moore's ICRA claim. *See id.* at 351 (rejecting comparator argument).

V.    **CONCLUSION.**

The Court GRANTS Defendants' Motion for Summary Judgment. (ECF 26.) The Clerk of Court is directed to enter judgment for Defendants and terminate the case.

**IT IS SO ORDERED.**

Dated: April 9, 2026

_____
STEPHEN H. LOCHER
U.S. DISTRICT JUDGE

10